RICHLANDS IRR. CO. v. WESTVIEW IRR. CO. et al.

No. 5954. Decided June 21, 1938. (80 P. 2d 458.)

*Henry E. Beal,* of Richfield, and *Badger, Rich & Rich,* of Salt Lake City, for appellant.

*J. A. Melville* and *Cheney, Jensen, Marr & Wilkins,* all of Salt Lake City, for respondent Westview Irr. Co.

*D. D. Crafts,* of Delta, for respondent Richlands Irr. Co.

HANSON, Justice.

This is a proceeding for an adjudication of water rights in the Sevier River pursuant to Chap. 67 of Laws of Utah 1919. The State Engineer reported a proposed determination, to which certain claimants filed written objections.

Thereafter and on February 21, 1931, the various claimants filed in court a written agreement settling and determining the rights of each and stipulating that a decree might be entered accordingly. On August 1, 1934, the District Court entered an order directing the State Engineer to distribute the river water in accordance with said proposed determination as modified by said stipulation pending final decision of the case. On January 4, 1936, the State Engineer filed his petition in the court alleging that differences had arisen as to the proper interpretation of the stipulation and agreement in respect to the rights of the Vermillion Irrigation Company (hereinafter called "Vermillion"), and praying a judicial interpretation thereof in aid of his official functions in distributing the water. The Vermillion and those claiming adversely to it appeared and submitted their opposing contentions. The case was tried and the court's findings and decree were, in substance, embodied in the court's general decree determining rights in the river, which was entered shortly thereafter. The Vermillion by timely objections and motion for a new trial, asserted error in the court's findings, conclusions and decree unfavorable to its contentions, and upon appeal to this court have assigned error in the same particulars. An outline follows of so much of the record facts as will serve to present the questions on which the parties divide.

The Sevier River has its source in the highlands of western Garfield County, in southern Utah, and flows in a northerly course through Piute, Sevier and Sanpete into Juab County, thence southwestwardly discharging into Sevier Lake in Millard County. It is the longest river in the State. The lands along its upper courses were earliest settled and a number of large canals were constructed for the irrigation thereof. Those with which we are here concerned are in Sevier County.

The Vermillion's canal diverts water from the river at a point on its west bank near Richfield and extends northwardly 25 or 30 miles to a point north of Redmond. The

canal of the Annabella Irrigation Company (hereinafter called "Annabella") has its intake on the east bank of the river about six miles south of the Vermillion intake. Tight dams are maintained just below each intake to facilitate diversion of the water into the canals. Between an eighth and a quarter of a mile above the Annabella dam is the intake of a short diversion ditch or channel called the millrace of the Sevier Valley Roller Mills (formerly Elsinore Roller Mills), by which water is diverted from the river for power purposes to operate the mills. This is a nonconsumptive use and the water is discharged immediately back into the river above the Annabella dam, and becomes available for irrigation. Further south, and upstream from the Annabella dam, spaced at various intervals along the river, are the intakes of the canals of the following named irrigation or canal companies, viz.: Richfield, Elsinore, Brooklyn, Monroe, Wells, Joseph, Elsinore Bench, Sevier Valley, and others which, with the Annabella and the Vermillion, are classed in the agreement settling rights and in the court's decree as Series A Primary water rights.

These Series A rights appear to have been early settled and adjudicated by court decrees, the first of which (termed the Jacob Johnson decree) was entered near the turn of the century. The other and later decree (termed the Morse decree), was entered May 16, 1906, and reduced somewhat the awards in the earlier decree, or some of them. The Morse decree awarded to said Series A Primary water rights as follows, so far as we need particularize:

| *(All year round consumptive basis)* | *Sec. Ft.* |
|---|---|
| Annabella Canal | 30.40 |
| Vermillion Canal | 37.80 |
| All other canals, save one, a total of | 176.76 |
| *(Part time consumptive basis)* | |
| Sevier Valley Canal | 178.00 |
| | |
| Total consumptive basis | 422.96 |

*(Nonconsumptive basis)*

Elsinore Roller Mills Co. (now Sevier Valley Roller Mills Company) : All the waters decreed to the Annabella and the Vermillion during the whole of each year, and from Nov. 1st to March 15 of each year, 32 sec. feet of water additional.

By the record and briefs it appears that subsequently to the Morse decree certain irrigation and canal companies interested in reclaiming large bodies of land along the lower courses of the river, finding insufficient unappropriated water by direct flow in the river available for their purposes, constructed at large cost and expense a dam in the river at a point in Sanpete County which backed the water up into an artificial lake or reservoir many miles in length, called the Sevier Bridge Reservoir, for storage and summer irrigation. Likewise, the Utah State Land Board constructed another dam, the Piute Reservoir, in the upper river channel in Piute County. Water filings were made for these reservoirs and other works in the State Engineer's office for all the available water not required to supply the earlier rights. Much additional lands came thus into actual or potential reclamation. The canal companies named as objectors and respondents in the caption appear to be interested in the water stored by one or both of these reservoirs, and are contesting the irrigation rights by direct flow claimed by the Vermillion.

These lower river canal companies became at once interested in acquiring and utilizing all of the unappropriated water of the river, and also in curtailing within the narrowest possible legal limits the water withdrawable from the river under the earlier appropriations, especially the primary rights under Series A of the Morse decree. They entered into negotiations with the officers and agents of the Series A canals to that end. After extended bargaining they finally reached an agreement with most of the Series A canals, defining and restricting their rights in the winter flow or winter diversion of the water into the canals, under the Morse decree. In return for rights surrendered by the latter in the nonirrigation season, they were given certain

storage rights in the Piute Reservoir for water deliverable on a call basis chiefly during the irrigation season. Not all the Series A users thus traded with the reservoir people. The Vermillion refused to do so, or to sign any agreement until a mutually satisfactory formula was evolved, adequate to protect their diversion rights from the river both during and beyond the irrigation or growing season of each year. A number of tentative forms or clauses were proposed and rejected until at length the following was accepted by both sides and embodied in the agreement or stipulation settling the rights before mentioned, viz.:

"Vermillion Canal Company:

"All the water of Sevier River accumulating therein between the Annabella Dam and the Vermillion Dam, not exceeding the period of use from January 1st to December 31st in each and every year: provided, however, that whenever the water yielded between the Annabella Dam and the Vermillion Dam shall not be sufficient to supply to said Vermillion Canal Company the said 37.80 c. f. s., then the rights hereinbefore mentioned and set out as primary rights under Section A shall pro rate equally with the said Vermillion Canal Company.

"37.80 c. f. s."

This paragraph and another to be later noticed appear to be the source of contention between the parties. Notwithstanding the care and pains expended in drafting it, they appear to be now unable to agree upon its meaning. The Vermillion asserts that its prior rights under the Morse decree to divert 37.80 second feet of water whenever needed and beneficially used, on a year-round basis, are preserved and protected thereby, and were intended so to be by the framers and signers thereof. The objecting respondents contend, on the other hand, that the words, "accumulating" and "yielded" as employed therein have reference to and mean only so much of the water present in the river between the two dams as is derived from the "make" of the river between the dams—that is, such water as the river picks up from its marginal percolations and flowage, surface and subsurface;

and that the quoted words do not refer to or include the flow of the river coming down stream and passing over the Annabella dam. Also that the Vermillion's rights in the flow of the stream (in excess of its marginal pick-up) are limited and restricted by the agreement to such times during the irrigation season as there is water in the river available under the agreement for diversion and use by the other Series A owners, so as to be susceptible to proration by them with the Vermillion. Other clauses in the agreement having cut off or greatly restricted the rights of Series A users (other than the Vermillion) in the nonirrigation seasonal flow of the river, respondents assert there can be no proration of water when there is no right to divert water for either use or proration; hence, that the all-year-round rights of the Vermillion under the agreement are restricted to the pickup or "make" of the river between the two dams, which is not subject to proration between Series A users under the agreement.

At the trial, in making its case, the Vermillion put in evidence the following: (1) The provisions of the Morse decree hereinbefore mentioned; (2) the agreement and stipulation of the parties settling rights in the river between them; (3) testimony of witnesses concerning the Vermillion's long continued use of the river water up to 37.80 sec. feet and more, its nature, necessity and beneficial effect, which we now summarize, viz.:

Since long prior to the Morse decree the Vermillion has continuously during each and every year, both during and beyond the regular growing seasons, diverted water from the Sevier River into its canal at its river dam, whenever needed or wanted for use, to the extent of 37.80 second feet, and at times much more than that amount, and without opposition or question by anyone; save that in November, 1934, the Piute Reservoir & Irrigation Company purchased from the Sevier Valley Roller Mills Company the water used by that company to operate its mills, and began to divert and impound the water so purchased in its reservoir until the Ver-

million brought suit to enjoin such diversion and use, when the water was turned back and the interference ceased. And about the same time (November 1934), the water commissioner, McBride, raised some question about it, but upon objection and protest by the Vermillion, McBride himself turned the water back and ceased interference. Diversion and use by the Vermillion for irrigation continued after the ordinary growing seasons each year. Alfalfa is the dominant crop of the stockholders although they have a substantial acreage in grains and sugar beets. The water is used in the fall, winter and spring months, whenever the ground is not frozen, both for nourishing the alfalfa and to prepare for plowing, and store the water in the soil for spring use. This is very beneficial, and without it the spring crop of hay would be reduced in yield by about one-third. The ground when irrigated acts as a sort of storage to reservoir the water for immediate use in the spring. Each stockholder gets the water by turns, the same in winter as in summer, and they employ a water-master to distribute the water all the year round. He keeps a record of the turns and amount of water distributed to each stockholder and user. In some years they irrigate practically all winter; in other years the ground is frozen for a time in either December or January or February, for as much as one and one-half or two months, or less. When the ground is frozen, they open the waste gates and let the water in the canal go right back into the river. This year there was "only three weeks we haven't irrigated." During all this time they have never been limited to the mere "make" or pickup of the river from its sides between the Annabella and Vermillion dams, but have been supplied from water coming from upstream and passing over the Annabella dam. This they have used, up to as high as 70 and even 100 second feet of water, through the ditch without anyone questioning their right. There are besides about 1200 people and about 10,000 head of cattle living on lands lying under and along the Vermillion canal and served thereby with water for domestic, culinary and stock watering purposes through-

out the winter and so-called nonirrigation season, and without the canal water would be put to extremes to get necessary water for these purposes. Cattle would have to be driven some distance to get water, which is not beneficial but injurious to dairy cattle. All during the irrigating season and in the fall they usually turn in about 35 to 40 feet of water for irrigating lands under the Vermillion system, which includes the Vermillion canal proper and two extensions, the Vermillion Extension and the Aurora. These two companies came in and bought water or stock in the Vermillion. That dates back to 1899 and 1877. Those companies irrigated both in summer and winter. The Roller Mills water has always been available and used through the Vermillion canal. From October 1st to April 1st, if they had been limited to the net "make" of the river between the Annabella dam and the Vermillion dam, which has been estimated at between two and three second feet, it would not go down in the canal farther than the neighborhood of Aurora, if that far; it would not get down to the lower end of the canal at all. James I. Rex, an experienced irrigator and officer of the Vermillion, testified that it would take from 12 to 15 feet of water in the canal to make it go through the entire canal and take care of the culinary, domestic and stock watering requirements, without using the water for winter irrigation at all. S. M. Jorgensen, another officer of the Vermillion, testified that if six second feet of water were turned into the Vermillion canal at the head some of it would probably get down to the upper end of the Salina District, probably hit the extension companies, but would not provide any domestic, stock or culinary water beyond that.

With regard to the so-called "make" or pickup of the river between the Annabella dam and the Vermillion dam, it was testified by the witness Warnock that for several miles down stream from the Annabella dam there is an actual loss in volume of water flowing in the river due, as other witnesses say, to the porous, gravelly and sandy nature of the river bed which absorbs or receives the river water into its inter-

stices and it sinks beneath the flow in the river bed; and that, if the Vermillion were required to deliver at the Vermillion dam all the water that comes over the Annabella dam (six miles above), it would be impossible because the loss is greater than the pickup. Mr. Warnock estimated a 10 to 15 per cent loss of water between the two dams. In order to avoid this loss of water into the river bed between the two dams, the Vermillion has in some years, by agreement with the Annabella Company, diverted its supply of water out of the river into the Annabella canal at its intake and brought it down in that canal, parallel with the river, and then discharged it into the river again at or about the Vermillion dam and thence into the Vermillion canal. Mr. Rex testified that he has been at the Annabella dam at a time when there would be from 15 to 20 feet of water coming over and none of it would get down to a point two and one-half (2½) miles below. Consequently, arrangements were made to divert the water from above, around the pervious section of the river bed. That refers to both the irrigating and nonirrigating seasons, and if they had to make good the loss between the two dams they would have to go out and buy water to put in the channel of the river.

J. L. Ogden, water commissioner in charge of distribution of the river water down to as far as the Vermillion dam, testified that he measured the river water in the previous March or April and found the "make" of the river between the Annabella and Vermillion dams to be 5½ feet, and through the whole season it was between 4 and 6 feet; that he used automatic records the whole season until the ice froze in the fall. At various times there was no water going over the Annabella dam. In 1935 the "make" was measured every two weeks from mid-July to November 1st and found to be about six feet. On May 7th last, there was 80 feet of water at the Annabella dam and 77 feet at the Vermillion dam, a loss of three feet in the flow between the two dams, plus the loss of the pickup between the two dams,—a total loss of nine second feet. There was a loss of the pickup

and three feet more. That pickup seemed fairly constant through the year—4 to 6 feet.

The witness Ogden also made some measurements of the river flow from the head of the Brooklyn Canal down to the Vermillion dam, a distance of two or three miles. There was a total loss of 31 second feet between those two points including the loss of the pickup—26 feet loss plus the pickup— a total of 31 feet loss. The river bed immediately below the Annabella dam is gravel filled with river sand, very porous for three miles anyway below the Annabella dam. During the winter season the pickup would about average even with the loss. When there is no water coming over the Annabella dam there is none lost in the gravelly river bed, and the "make" of the river in the last three miles is available at the Vermillion dam. But if there is water coming over the Annabella dam the loss in that water offsets the pickup down below. And if the Vermillion is required to redeliver at the Vermillion dam what it gets at the Annabella dam, it loses its water rights for all purposes, culinary, domestic and irrigation.

"I have made measurements during the non-irrigating season with 20 or 30 feet of water flowing and a recorder at both dams, and I always figured the flow at the two dams about equal; the whole series of measurements seemed to bear that out."

S. M. Jorgensen, an officer of the Vermillion, testified that he was one of the Vermillion committee in framing the stipulation settling the rights and that in so doing the word "arising" and the words "the make of the river between the two points" were proposed and discarded, and in lieu thereof the word "accumulating" was used as sufficiently explaining that to which they were referring. "We were simply trying to set out as near as we could our rights according to the Morse decree, which was 37.80 second feet without limitation of use."

There was no evidence to contradict or disparage the foregoing testimony for the Vermillion. Attention was called

by respondents' counsel to a recital in the statement of water right claim filed by the Vermillion pursuant to notice to all consumers, which contains the recital of 37.80 second feet for an annual use period from March 1st to November 15th, and signed by its president. But in view that there was a written agreement signed by all parties to this present controversy, defining the rights of each claimant, and that of the Vermillion as from January 1st to December 31st of each year, we do not regard the claim filed as controlling in this respect. The claim filed, like any other pleading, may limit proof of the claimant contrary thereto in the face of objection from an opponent. But when all parties agree on the rights of the claimant and stipulate that a decree may be entered in conformity thereto, the objection does not lie that the relief given exceeds the statement of claim. Besides, the statement of claim states upon its face that the Vermillion claims the right decreed by the court in the Morse decree (which is for a year-round use) for 37.80 second feet of water. And in response to the printed question: "Q. Do you use water for irrigation outside the growing season?" the answer was, "Both spring and fall." And to the question: "For what crops?" the answer was, "To irrigate alfalfa and for fall plowing."

The District Court found and decreed an interpretation of the agreement agreeably to the respondents' contentions and contrary to that of the Vermillion with respect to the meaning and intent thereof, especially in its use of the words "accumulating" and "yielded" employed in the paragraph we have quoted, supra. The court held and decreed that the year-round rights of the Vermillion to divert water from the river into its canal, exercisable during nonirrigation seasons, is limited to the so-called "make" of the river between the Annabella dam and the Vermillion dam, and that the meaning of the words "accumulating" and "yielded" as employed therein must be restrained to such "make"; that is, to water coming into the river from flowing or percolating sources on either side of the channel.

To this holding we cannot accede. Both sides invoke the settled doctrine that when a writing is clear and plain on its face, not ambiguous or doubtful, there is no room for construction but resort must be had to the language employed in determining meaning or intention. The rule is a sound one and fully applicable to the disputed clauses in the agreement here in question. The language employed is not doubtful or ambiguous; the meaning and intent are conspicuously clear and plain. It awards to the Vermillion 37.80 c. f. s. of "all the water of the Sevier River accumulating therein between the Annabella Dam and the Vermillion Dam not exceeding the period of use from January 1st to December 31st of each year." We must know judicially that the water in a river between any two points is not accumulated there solely from the contributions thereto from marginal sources, but that the major portion thereof comes by natural flow from upstream sources which have fed the channel itself, step by step, clear back to its ultimate source or sources. The entire watershed to its uttermost confines, covering thousands of square miles, out to the crest of the divides which separate it from adjacent watersheds, is the generating source from which the water of a river comes or accumulates in its channel. Rains and snows falling on this entire vast area sink into the soil and find their way by surface or underground flow or percolation through the sloping strata down to the central channel. This entire sheet of water, or water table, constitutes the river and it never ceases to be such in its centripetal motion towards the channel. Any appropriator of water from the central channel is entitled to rely and depend upon all the sources which feed the main stream above his own diversion point, clear back to the farthest limits of the watershed. There is no reason or justification (in the words employed by the parties in this document) for restricting the Vermillion's reliance on the accumulation of water above its dam to such a small fractional portion thereof as the evidence in this case shows may be derived from marginal

sources within the six miles between the two dams. But whether great or small, the marginal contributions are not the sole factors in the accumulation of waters between the two dams. The main contribution, from the very nature of the case, must come from upstream sources. There is no controlling significance in the specification of "all the water accumulating in the river" between the two dams; not, at least, without a showing that the lower (Vermillion) dam backs the water up for six miles and to such depth that the accumulated water extends clear over and beyond the Annabella dam in depth exceeding that of the flowing water at the latter point. No such showing has been made, or probably could be. If not, the Vermillion does not exceed its rights in taking out 37.80 second feet from the accumulated water between the two dams, from whatever source accumulated.

Webster's definitions of "accumulate" as meaning "to heap up in a mass; to pile up; to collect or bring together; to amass; gather, store up, aggregate, hoard," etc., imply no restriction as to the source, means or methods of the accumulation. A fruit tree accumulates water and nourishment from the earth by means of every one of its thousands of roots and rootlets spreading in every direction, and every apple or peach on the tree is an accumulation or reservoir of that moisture and nutrition, owing naught to any one source more than to another. The whole crop of fruit on each tree is the "yield" of that tree. The entire yield of an orchard is the "accumulation" of moisture and nourishment taken by all the trees from the ground by all (not merely some) of the roots which tap the source of supply in the ground covered by the orchard. The same principle applies to a field of grain nourished, produced and yielded by all its individual stalks and its myriads of roots and rootlets which suck up moisture and nutrition from the ground. Every one of its roots are a point of contact with the source of supply, not merely some of them, or those near the margin of the field.

Likewise, the word "yield" is often employed in nearly the same sense as "accumulate" or "produce." Thus, the yield of an oil well, from whatever source derived, the revenue from a tax levy, the return from an investment or a mercantile venture, none of which implies a segregation or specification of a specific source of the increase, gain or accumulation. The specification here is that the accumulation on which the Vermillion may draw for its water supply up to 37.80 second feet is that found in the river between the two dams, six miles apart. This may perhaps exclude the idea that the Vermillion could change its point of diversion to some place above the Annabella dam or below the Vermillion dam.

It will be noticed that in the paragraph we have quoted from the contract settling rights there are two separate and independent provisions. The first is a year-round right up to 37.80 second feet, without any reference therein to redundancy or scarcity of the supply of water in the river. The other provision relates solely to times of scarcity when there is insufficient water in the river to supply in full all of the awards made to Series A users by the contract. In such a situation, under the law as it stands independently of the contract, all those of equal right and priority must prorate the shortage between them. The contract does nothing more or different from what the law would require and enforce had the contract made no provision for such an emergency. It tallies with the law.

The contention of respondents that the first and general clause of the contract cannot operate at all except in times of shortage or of a special emergency, requiring proration among those enjoying equal priorities, cannot be upheld. We cannot indulge the assumption that a rule of action prescribed for special emergencies only was intended to exclude all benefits whatever except emergency benefits.

An auxiliary feature of the contract leading to the same conclusion is that contained in its award to the Sevier Valley Roller Mills Company of water for power purposes

to operate its mills. That award is of—"All the waters decreed herein to the Annabella Irrigation Company and the Vermillion Irrigation Company through the millrace of the said Sevier Valley Roller Mills Company in Sevier County, for power purposes only, during the whole of each and every year;" plus a supplementary award of 32 second feet during part of the year, with which we are not here concerned. As we have noticed hitherto, the Mills Company takes its supply of water out of the river at a point less than a quarter of a mile above the Annabella dam by a short ditch or millrace which conducts the water to and through the mill, and then immediately turns it back to the river again above the Annabella dam. Were this use other than nonconsumptive, the provision giving to the Mills Company water elsewhere given and decreed to the two canal companies would be inexplicable. Being nonconsumptive, there is no conflict of rights between the awards for power and irrigation purposes. But the controlling feature of the provision, militating against respondents' contention, is in its recognition that water taken out of the river at a point some distance south of and upstream from the Annabella dam is water of which the destination and use is intended and decreed to the two canal companies mentioned,—and this throughout the entire year. Whereas, respondents claim by their interpretation of the awards made to the Vermillion that it has no right to any water at all coming over the Annabella dam during the nonirrigation season—a large part of the year—save such water as the water commissioner may see fit to allot for domestic and stock watering purposes. We find no clause whatever in the contract authorizing this last restriction. The rights allotted to Vermillion under the Morse decree and under the contract settling rights in this case cannot be made dependent upon the exercise of discretionary power by the water commissioner. In the case of domestic and stock water it is a matter of life and death, and even as to irrigating water the rights accorded rise superior to autocratic or discretionary power.

There is a further clause in the contract settling rights about which controversy has arisen. It provides that:

"In computing water to be distributed to the rights hereinbefore set out in Section A, there shall be allowed to the credit of said rights 22 c. f. s. as and for the make of the river between the said two Kingston gauging stations and the gauging station known as 'Sevier River Below Piute Dam,' as now located below the dam of the Piute Reservoir Company."

As explained in the briefs, the purpose of this cause was to provide for the following situation: The Piute Dam in the Sevier River in Piute County backs the water up in the river a distance of several miles, and all the "make" or contributions to the flow of the river from surface or subsurface sources along that part of the river now flows directly into the lake or reservoir created by the dam. That is upstream from all the canals in Series A in Sevier County and represents a subtraction from the natural flow of the river that would, without the dam, come on down to and feed the canals designated Series A. In framing the contract settling rights, Series A people naturally insisted on some compensating clause, and so the clause above quoted was inserted.

The District Court erred in limiting and restricting the Vermillion's water rights and priorities, and its proration rights under the clauses of the contract discussed; in its definition of the words "accumulating" and "yielded"; in its restriction of the Vermillion's water rights in the flow of the river during and after the irrigation season of each year; in its denial of proration rights after the so-called irrigation season as well as during the season and throughout the year; in decreeing that only so much water need be delivered in winter season as the river commissioner in his judgment may approve. Where parties litigant, instead of assembling witnesses and putting on their proofs, reduce their respective rights and priorities to writing and stipulate that a decree may be entered in

conformity thereto, such contract if lawful has a binding effect on the decree that may be entered. It has all the binding effect of findings of fact and conclusions of law made by the court upon evidence, and more. A court may modify its findings in apt time but it cannot change or modify a contract of the parties. In the particulars pointed out, the court by its findings, conclusions and decree varied the contract of the parties and substituted provisions not in harmony therewith. The contract of the parties amounted to a stipulation that all the facts necessary to support such contract and a decree in conformity thereto pre-existed and would be sustained by available evidence, had not the agreement of the parties dispensed with the taking of evidence. This included the element of actual, necessary and beneficial use of the water during non-irrigation seasons to the full extent and amount of the right claimed, viz.: 37.80 second feet of water the year-round. This does not mean incessant user in winter any more than in summer, but the right to call for that amount of water to the extent needed and desired in all seasons,—summer, fall, winter, and spring. The agreement in writing is equal to an express court finding of facts to support the year-round water rights described therein.

We are of opinion, and so hold, that the District Court in decreeing water rights pursuant to the stipulations of the parties cannot lawfully, by zoning the river or otherwise, give junior claimants, either by direct flow or storage from winter flow of the river, rights or priorities that are superior to the Series A primary water rights, or preference of service by the State Engineer or Water Commissioner in distributing the waters of the river whenever the flow is insufficient to supply said Series A rights. To the extent that the reservoirs have purchased or traded for, and thereby acquired, some of the Series A primary rights, to that extent they have become substituted to the rights of the original owners of the rights so acquired. It does not appear by the record before us that they have

succeeded to any of the rights of the Vermillion in either the summer or winter flow of the river, to the extent of its 37.80 c. f. s. water awarded it under the Morse decree, and continued in effect by the stipulations. We hold that all the Vermillion's rights under the Morse decree remain intact, are not reduced or impaired by the contract settling rights, but are preserved and protected thereby.

The errors assigned are sustained. The decree of the District Court is reversed and the cause remanded with instructions to make new findings, conclusions and decree in conformity to the views herein expressed. Costs to appellant.

MOFFAT and LARSON, JJ., concur.

WOLFE, Justice (concurring in part, dissenting in part).

I cannot agree with the court's opinion that the language in the stipulation was "not doubtful or ambiguous" and that "the meaning and intent are conspicuously clear and plain." In view of the fact that the Vermillion Company must have intended to give up some of the rights granted it under the Morse decree, the language of the stipulation is puzzling. If, after the stipulation, the Vermillion was to have just what it had before under the Morse decere, the stipulation would have been useless. For that reason, I cannot agree that the Vermillion Company "had the right to call for that amount of water [37.80 c. f. s.] to the extent needed and desired in all seasons." And for the same reason, I cannot agree "that all the Vermillion's rights under the Morse decree remain intact, are not reduced or impaired by the contract settling rights, but are preserved and protected thereby."

The Morse decree gave the Vermillion Irrigation Company, as one of the parties having primary rights, 37.80 c. f. s. all the year round out of the natural flow of the river. It is unthinkable that if the Vermillion Company meant to preserve just this same right—give up nothing—it would have gone through all the throes of endeavoring to find

language in the stipulation, awkward at its best, to accomplish this very same thing. When the expression relating to water accumulating between the dams is examined in the light of the history leading to the negotiations, the use and meaning of these words becomes even plainer. When the Morse decree was signed in 1906, there were no large storage reservoirs involved. All rights were direct flow rights and there was no need of limiting these for the growing season. The Sevier Bridge and Piute Reservoirs were constructed to catch the run-off and use it during the irrigation season. Then it became necessary to know during what periods they could take the water for storage and how much. None of the companies having all-year rights would have been compelled to yield anything except what they could not, under any guise, show they were not putting to beneficial use during the nonirrigating season. But these reservoirs were also of use to them to store waters in the irrigating as well as nonirrigating season so that they could more economically use their water. They could then store it and spread the use of it over the growing season according, not so much to the flowing quantities, but as they needed it. This made an incentive for stipulating limitations on their rights during the non-irrigating season. And this led to the signing of the stipulations of February 20, 1931, mentioned on page 411 of this volume, by which these primary water right users limited their period of use from April 16th to October 15th of each year. The Vermillion Company wanted better terms than the other primary users. The other users were willing to forego the use of any waters between October 15th and April 16th of each year (this was subsequently changed to deny water from September 30th to April 1st of each year, except that the Vermillion Company did not join in this amendment). But the Vermillion Company would not forego *all* of its winter water. What did it really forego? Respondents say all except the "make" between the Annabella and Vermillion dams. Appellant says the Vermillion Company was willing to forego the right to have

the winter *natural* stream flow past its intake as it was entitled to have under the Morse decree but it wanted the privilege of taking up to 37.80 c. f. s. *from what flowed between the dams,* whatever that might be.

It seems to me that the court has gone further than the Vermillion claims. It puts the Vermillion Company where it was before the stipulation; that is, gives it the right to call for up to 37.80 c. f. s. just as it had under the Morse decree from the stream as it originally flowed before storage rights were obtained.

I think the key to the situation lies in the water to which the Sevier Valley Roller Mills Company was entitled. Under the stipulation it was entitled to "all the waters decreed herein to the Annabella Irrigation Company and Vermillion Irrigation Company through the millrace of said Sevier Valley Roller Mills Company in Sevier County for power purposes only, during the whole of each and every year." The prevailing opinion banks on the contentions made by appellant, to wit, that the Roller Mill water is described in terms of the water of the Vermillion and Annabella companies. The argument seems to put a little reverse English on the clause. The argument runs as follows: If the Roller Mill was entitled to use all the water which the Vermillion and Annabella companies were entitled to use and the Roller Mill was entitled to run through its millrace all of the water which came down the stream for the benefit of those two companies, then those two companies are entitled to use all the water which runs through the millrace of the Roller Mill. The fallacy lies in this, that the measure of the right of the Roller Mill was what *under the Morse decree* the Vermillion and Annabella companies were entitled to. It was not intended to measure the right of the Vermillion and Annabella companies by what the Roller Mill used. Since the Mill had a non-consumptive right, the measure of its right under a stipulation between *it* and all the other parties to the stipulation could still be measured in terms of the rights of the Vermillion and Annabella companies *under the*

*Morse decree.* But where a long stipulation which contains by contract the law which is to prevail not among all as much as between various groups, is signed by all parties, it does not necessarily mean that some provision of the stipulation made to govern parties A. and B. should also control as between C. and D., or between A. or B. and C. A stipulation in respect to water matters is in many cases a bundle of special stipulations between different sets of all the parties that sign the stipulation. It may in cases be quite hazardous and even unfair to use part of the stipulation meant to fix the rights between A. and B. to construe another part of the stipulation between A. or B. and C. It seems to me this is the situation in the case at bar. Part of the stipulation which measures the Roller Mill water in terms of Vermillion and Annabella former water rights is used to support a claim of the Vermillion Company that as between Vermillion Company and respondents, the Vermillion Company right was as specified in the Roller Mill part of the stipulation, when it was apparent that the rights of those two companies under the old Morse decree unchanged by the stipulation was used to measure only the nonconsumptive right of the Roller Mill. Therefore, I cannot agree with the statement in the opinion that "the controlling feature of the provision, militating against respondents' contention, is in its recognition that water taken out of the river at a point some distance south of and upstream from the Annabella dam is water of *which the destination and use is intended and decreed to the two canal companies mentioned.*" (Italics added.) For the reasons above stated, I think the italicized portion is not a correct statement of the facts.

What I think the Vermillion Company and respondents had in mind when they negotiated was about as follows: The Vermillion Company was willing to make some concession to the storage company for the right to have its summer water stored and subject to call, but being in an enviable position where the storage companies would largely be compelled to grant that privilege at all events as an incident to

the distribution of other waters, it was not willing to forego all of its winter water as were the other primary users. Neither was it willing to accept just the "make" of the river between the two dams. Jorgensen, representing the Vermillion Company, said that in the negotiations "There were other words suggested, such as 'arising' and such as the 'make' of the river between the two points." "They were all discarded and the word 'accumulation' was used as sufficiently explaining what water we were referring to." This illustrates, it seems to me, plainly that the Vermillion Company was not willing to be held to the mere 'make' of the river, but it also indicates just as strongly that it was willing to forego its absolute right to 37.80 c. f. s. which it had under the Morse decree. Otherwise, as said before, why all the negotiating? All the Vermillion Company would have had to say would have been: "We will not stipulate. We will stand on our Morse decree rights." What was done was this:

"As long as there is any water between the dams we shall have the right to take up to 37.80 c. f. s. And during the irrigation season we have a right at all events to that amount, but during the nonirrigating season we shall have the right up to that amount, not absolutely, but only *from the water between the two dams.*"

It may be argued that since the reservoir companies must under the stipulation with the Roller Mills leave down for that company the 37.80 c. f. s. which the Vermillion Company under the Morse decree was entitled to, that there will "accumulate" between the two dams at least that amount of water and that, therefore, it amounts to the same thing as if the Vermillion Company could call for the 37.80 c. f. s. at all events. But a closer view will reveal that the situations are not the same. Under that part of the stipulation between the Vermillion and the respondents the former can only take its 37.80 c. f. s. from the "accumulation." If the "accumulation" is lessened because the storage companies during the nonirrigation season need no longer supply the Roller Mills, then there will be a lesser amount between the

dams from which the Vermillion can draw. But the prevailing opinion makes it obligatory on the storage companies to leave down at all events for the Vermillion Company 37.80 c. f. s. whether or not the former purchase the rights of the Roller Mills Company. It is in this respect that I consider the majority opinion in error. And it is for this reason that I think the opinion in error when it takes the measure of the water to which, under the stipulation, the Roller Mills is entitled and infers from that measure a recognition that the Vermillion Company was entitled to use that water at its point of use.

The majority opinion also relies for its support on certain claimed hardships to the 1200 users of Vermillion water. But that is not sufficient to permit this court to vary the terms of the contract. It may be that the "pickup" of the river during the nonirrigation season would not be sufficient to make that amount of water go through the canals to the lands and stock of appellant, but the matter is not as bad as is painted. Despite the statement in the prevailing opinion that the "pickup" water would not provide domestic or culinary water beyond the extension companies, the stipulation provides:

"In computing water to be distributed to the rights hereinbefore set out in Section A, there shall be allowed to the credit of said rights 22 c. f. s. as and for the make of the river between the said two Kingston gauging stations and the gauging station known as 'Sevier River Below Piute Dam,' as now located below the dam of the Piute Reservoir Company.

"In addition to the rights hereinabove set out under 'Section A' hereof, the owners and users thereof, except as hereinabove otherwise provided, shall have the right to such use of the waters of Sevier River and its tributaries as may be reasonably necessary for culinary, domestic and/or stockwatering purposes, to be distributed to them under the supervision of the Sevier River Water Commissioner, at their said respective points of diversion, during the remainder of each year, where use is not herein provided for irrigation purposes.

"Whenever the waters available for distribution in said river, flowing in said Section A, are insufficient to supply all the waters of each class therein, then each said class shall have precedence in their order

as herein set out, and the rights of each party in each said class shall be diminished pro rata."

It may be that under this section when the water to which appellant is entitled does not actually reach it, it may be entitled to a diversion of sufficient carrier water to transport culinary, domestic and stockwater on the theory that the use in such cases by the actual physical situation is not "provided for irrigation purposes." But we are not required to solve that problem.

The prevailing opinion says:

"The contention of respondents that the first and general clause of the contract cannot operate at all except in times of shortage or of a special emergency, requiring proration among those enjoying equal priorities, cannot be upheld. We cannot indulge the assumption that a rule of action prescribed for special emergencies *only* was intended to exclude all benefits whatever except emergency benefits." (Italics added.)

The meaning of this language is not clear to me. The last sentence seems to contain a contradiction. Are we to presume that a "rule of action" made for the purpose of taking care of a shortage or an emergency is to be extended to cases where the rule of action is not applicable?

To sum up: (1) I agree with the prevailing opinion that the word "accumulation" means more than the "make" of the river; that it means that water which flows between the dams. I think this is also borne out by the following, mentioned by neither party nor in the prevailing opinion. The stipulation reads in part as follows:

"* * * provided, however, that whenever the water *yielded between the Annabella Dam and the Vermillion Dam shall not be sufficient to supply to said Vermillion Canal Company the said 37.80 c. f. s.*, then the rights hereinbefore mentioned and set out as primary rights under Section A shall prorate equally with *the same Vermillion Canal Company.* 37.80 c. f. s."

The respondents correctly state that, outside of a few fragments, there was no water distributable during the non-

irrigation season after the stipulation of 1931 among the primary direct flow users under the Morse decree, because they all agreed to forego such use to permit storage. Consequently, and to my mind correctly, respondents argue that the part of the stipulation above quoted could not have meant proration during the nonirrigation season because there was nothing to pro rate. If this is true, why were used the words "water *yielded* between the Annabella Dam and the Vermillion Dam" to cover the irrigation season, when during that season the Vermillion Company was unquestionably not restricted to water "yielded" between the dams but to the flow up to 37.80 c. f. s.? It thus appears that the term "yielded" was used to designate water "flowing" between the two dams. (2) I do not agree with the prevailing opinion that the Vermillion's right is as under the Morse decree, but that it takes its water during the nonirrigation season only from such water as may flow between the two dams. The respondents are not required to keep sufficient flowing between those two dams to supply the Vermillion Company during the nonirrigation season with 37.80 c. f. s. *because of any right on the part of said company* to demand at all events such amount. The Vermillion Company is entitled to take such amount of the water as "accumulates" (flows) between the two dams, but if it does not flow because the respondents purchase the Roller Mills' right of flowage or for other reasons, the Vermillion Company cannot demand that such amount, nevertheless, be left down during the nonirrigation season.

FOLLAND, Chief Justice (concurring in part, dissenting in part).

I concur in the views expressed in the opinion of Mr. Justice WOLFE.