2005-NMCA-071

114 P.3d 339

Lynn MONTGOMERY, Dr. Robert Wessely, and Dr. Catherine Harris, Protestants–Appellants,

v.

NEW MEXICO STATE ENGINEER, Appellee,

and

Lomos Altos, Inc. and Garden Path Associates, Applicants–Appellees.

No. 24,297.

Court of Appeals of New Mexico.

April 12, 2005.

Certiorari Granted, 29,202, June 2, 2005.

Mary E. Humphrey, Connie Odé, Humphrey & Odé, P.C., El Prado, for Appellants.

DL Sanders, Chief Counsel, Hilary Lamberton, Special Assistant Attorney General, Office of the State Engineer, Santa Fe, for Appellee State Engineer.

Maria O'Brien, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Catherine F. Davis, Hunt & Davis, P.C., Albuquerque, for Appellees Lomos Altos, Inc. and Garden Path Associates.

*OPINION*

PICKARD, J.

{1} Lomos Altos, Inc. and Garden Path Associates (Applicants) submitted three applications to change the point of diversion and purpose of use for their surface water rights in Valencia County to groundwater rights in Sandoval County. The State Engineer conducted a hearing on the applications. Although Protestants argued that the applications should be denied, the State Engineer granted the applications. Protestants appealed the decision to the Sandoval County district court. The district court, upon its de novo review of the State Engineer's decision to approve the applications and upon cross-motions for summary judgment, granted summary judgment in favor of Applicants. Protestants appeal the district court's granting of summary judgment.

{2} Protestants argue that the district court (1) did not apply the correct law when it determined that the applications were not for new appropriations of surface water or groundwater, (2) erred in granting Applicants' motion for summary judgment because a genuine issue of material fact existed regarding the water rights associated with the springs located within the move-to area, (3) did not apply the correct law in determining that Applicants' transfer of water rights would not impair water rights within the move-to area, (4) erred by not allowing a trial to proceed on the issues of public welfare and conservation, and (5) improperly denied Prot-

estants' motion for summary judgment. We hold that the district court correctly applied the law in determining that these applications were not for new appropriations, correctly determined that no genuine issue of material fact existed concerning the water rights associated with the springs within the move-to area, and correctly applied the law regarding the issue of impairment. Furthermore, because Protestants did not respond to Applicants' assertion that no genuine issue of material fact existed regarding the issues of conservation and public welfare, the district court correctly granted Applicants' motion for summary judgment concerning these issues. Finally, we conclude that the court correctly denied Protestants' motion for summary judgment. Accordingly, we affirm.

## FACTS AND PROCEEDINGS

{3} Applicants filed three different applications with the State Engineer to transfer a total of 15.05 acre-feet per year of existing water rights from Valencia County, the move-from site, to Sandoval County, the move-to site. The applications sought a permit from the State Engineer to change the purpose of use of Applicants' water rights. Applicants wanted to change the use from surface water rights utilized primarily for irrigation in Valencia County to groundwater rights used for domestic purposes in Sandoval County. Both the move-from and move-to sites are located within the Middle Rio Grande Basin.

{4} Protestants own and use surface water rights in the Placitas area of Sandoval County. Upon receiving notice of the applications, Protestants informed the Office of the State Engineer that they objected to the granting of the applications. Protestants' objections were based on their contention that the applications, if approved, would be detrimental to public welfare, would be contrary to conservation, and would impair their existing water rights. By order of the State Engineer, all three applications were consolidated and a hearing was held to determine if the applications should be approved. After a full evidentiary hearing, at which Protestants argued that the applications should not be granted, the Office of the State Engineer approved the applications. In its order approving the applications, the State Engineer found that the applications would not be detrimental to the public welfare of the state, would not be contrary to the conservation of water within the state, and would not impair existing water rights from their source. Protestants filed a timely appeal to the Sandoval County district court and subsequently filed a motion for summary judgment. Applicants filed a response to Protestants' summary judgment motion, and they also filed a cross-motion for summary judgment. After a hearing, the district court entered an order granting Applicants' cross-motion for summary judgment and denying Protestants' motion. The district court ruled that the applications were approved in accordance with the report and recommendations of the State Engineer's hearing examiner, but made no separate findings of its own. Protestants appeal from this order. Additional facts appear below as they pertain to this decision.

## DISCUSSION

{5} We will begin our analysis by discussing whether the applications should be considered a new appropriation of ground or surface water, or whether the applications should be regarded as a transfer of Applicants' water rights. We will then address Protestants' argument that the district court erred in finding no genuine issue of material fact as to how certain water rights should be considered by the State Engineer when making an impairment determination, after which, we will discuss Protestants' contention that the State Engineer misapplied the law regarding the issue of impairment. We will then proceed with a discussion of whether the issues of public welfare and conservation were appropriately decided by the district court's summary judgment order. We will conclude by analyzing whether the district court should have granted Protestants' motion for summary judgment.

**ISSUE ONE: The district court applied the correct law when it determined that the applications were not for new appropriations of surface water or groundwater.**

{6} Protestants challenge the district court's ruling that the applications sought a transfer of water rights. Specifically, Prot-

estants argue that the effect of groundwater pumping pursuant to the applications will result in new depletions of surface water at the move-to site, and these new depletions constitute a new appropriation of surface water as a matter of law. Protestants further argue that, since the surface waters of the Rio Grande stream system are fully appropriated and the State Engineer has expressly forbidden any new surface water appropriations from the Rio Grande, the applications must be denied. Although Protestants do not challenge the fact that the groundwater of the Middle Rio Grande Area has not been fully appropriated, Protestants also argue that the applications should be considered as new appropriations of groundwater.

{7} We review the question of whether the district court properly interpreted the applicable law de novo. *See Gallegos v. State Bd. of Educ.*, 1997–NMCA–040, ¶ 11, 123 N.M. 362, 940 P.2d 468 (holding that this Court is "not bound by the conclusions of law reached by the trial court, and the applicable standard of review for such issues is de novo"). We will first discuss whether these applications were for new appropriations of surface water, and then turn our attention to the issue of whether the applications were for new appropriations of groundwater.

A. *The applications were not for new appropriations of surface water.*

{8} In New Mexico, applications seeking new appropriations of surface water must meet different requirements than applications requesting a permit to transfer the location of existing surface water rights. NMSA 1978, § 72–5–7 (1985), which governs applications seeking new appropriations of surface water, requires the State Engineer to reject an application if the State Engineer determines that there is no unappropriated water available. The State Engineer can also reject an application under Section 72–5–7 if the State Engineer finds that the application would be detrimental to public welfare or contrary to conservation of water within the state.

{9} In contrast, NMSA 1978, § 72–5–23 (1985), which governs applications seeking to transfer surface water rights, does not require the State Engineer to make a determination that there is unappropriated water available. However, a transfer application may not be approved unless the State Engineer finds that the transfer will not be detrimental to existing water rights. *Id.* Additionally, Section 72–5–23 requires the State Engineer to find that the transfer application will not be detrimental to public welfare or contrary to conservation within the state.

{10} In this case, the district court affirmed the State Engineer's findings that the applications were requests to transfer existing surface water rights in order to receive a permit for groundwater use. Protestants contend that the applications should be considered new appropriations of surface water since all parties have agreed that new depletions of surface water will occur at the move-to site if the applications are approved. We do not agree.

{11} Protestants rely primarily on *Durand v. Reynolds*, 75 N.M. 497, 406 P.2d 817 (1965), to support their argument that new depletions of surface water at a move-to site may constitute a new appropriation of surface water. In *Durand*, the State Engineer denied an application for a permit to transfer surface water rights at one location to groundwater rights at another location. *Id.* at 498, 406 P.2d at 817–18. In that case, the move-from site and the move-to site shared the same source of water, yet no evidence was entered indicating that water from the source flowed evenly to both sites. *Id.* at 500, 406 P.2d at 819. Protestants rely on the following language from *Durand:*

> It is applicants' position that they are merely exchanging rights to X number acre-feet of water in the "Nine–Mile Draw" (Move–From) area for X number acre-feet of water at the proposed well location (Move–To) sites. They contend that since there is a common source, the "valley fill," they cannot impair existing rights.... Applicants did not prove that the water in the "Nine–Mile Draw" area flows evenly to the site of the proposed well locations! To the contrary, the record yields expert testimony that certain amounts of the water that would be taken

by the proposed wells never contributed to the water taken in the "Nine–Mile Draw" area. Assuming such to be true, the effect of applicants' application, if granted, would be to grant a new appropriation to water in which they did not previously have any rights.

*Id.* at 500–01, 406 P.2d at 820 (internal quotation marks and citations omitted). Protestants argue that this principle announced in *Durand* is applicable to the case at hand. Yet, in *Langenegger v. Carlsbad Irrigation District*, 82 N.M. 416, 483 P.2d 297 (1971), *limited on other grounds by State ex rel. Martinez v. City of Roswell*, 114 N.M. 581, 587, 844 P.2d 831, 837 (Ct.App.1992), our Supreme Court found the language quoted above from *Durand* was unsupported dictum. The *Langenegger* Court stated:

> If this language found in the *Durand* decision means a change in point of diversion can legally be accomplished only if the waters to be taken from a proposed point of diversion are identical with the waters that have been taken from a presently established point of diversion, then there could be very few, if any, changes in points of diversion.

*Id.* at 420, 483 P.2d at 301. The Court went on to conclude that the owner of water rights has the inherent right to transfer the location of those water rights, "subject only to the requirement that the rights of other water users not be injured or impaired thereby," even if the waters between the two points of transfer do not flow evenly. *Id.* at 420–21, 483 P.2d at 301–02.

{12} In the present case, unlike *Durand*, the State Engineer has promulgated specific guidelines that apply only to groundwater applications within the Middle Rio Grande. The guidelines cover an area known as the Middle Rio Grande Administrative Area (MRGAA). Because both the move-from and move-to sites in the present case are located within the MRGAA, all parties agree that the guidelines apply to the applications submitted by Applicants. Unlike the situation presented in *Durand*, the guidelines expressly state that all areas within the MRGAA are hydrologically connected and that a groundwater applicant must obtain and transfer surface water rights located within the MRGAA in order to offset the adverse effects the groundwater use may have on the surface flows of the Rio Grande stream system. In *Durand*, the factual basis for the Court's ruling was that the transfer of water rights from the move-from site to the move-to site was not sufficient to offset the new depletions at the move-to site and there would therefore be an impairment, as the State Engineer found in that case. *Id.* at 500–01, 406 P.2d at 820. Yet, within the MRGAA, the State Engineer has found that because of the hydrological connection of the area, an adequate offset of surface water rights in one area of the MRGAA is sufficient to offset any depletions caused by groundwater use in another area of the MRGAA. *See Stokes v. Morgan*, 101 N.M. 195, 202, 680 P.2d 335, 342 (1984) (holding that the "special knowledge and experience of state agencies should be accorded deference").

{13} Additionally, the Court in *Durand* held that the applicants in that case were requesting a new appropriation of surface water because the water at the move-to site never contributed to the water at the move-from site. *Id.* at 500–01, 406 P.2d at 819. Yet, in this case, Protestants agree that the move-from site is part of the middle Rio Grande stream system. Protestants further conceded below that "the groundwaters in the move-to area are hydrologically connected to the Rio Grande and that the underground waters contribute to the flow of the Rio Grande, thus constituting a part of the source of the stream flow." Thus, in this case, unlike the situation that was presented in *Durand*, the water at the move-to site contributed to the waters at the move-from site.

{14} Protestants do not challenge that the water rights held by Applicants are valid. Protestants also do not challenge the State Engineer's finding that the surface water rights transferred by Applicants were sufficient to offset any adverse effects upon the Rio Grande. Therefore, we find this case to be distinguishable from *Durand* and conclude that, under the circumstances of this case, new depletions of surface water at the

move-to site do not constitute a new appropriation of surface water.

B. *The applications were not for new appropriations of groundwater.*

■ {15} Protestants also contend that the applications, as a matter of law, should be regarded as new groundwater appropriations. Protestants argue that, while groundwater applications in the MGRAA require transfer of valid water rights in an amount sufficient to offset any adverse effects to the surface flow of the Rio Grande, the applications, if approved, grant a new appropriation of groundwater. We do not agree.

{16} As we have previously noted, the guidelines administering groundwater applications within the MRGAA require a transfer of sufficient surface water rights prior to granting a permit for new groundwater use. Because of this requirement, the State Engineer handles applications for a new use of groundwater within the MGRAA as an application to change the point of diversion and purpose of use of the existing water rights. Protestants agree that the State Engineer has handled groundwater applications within the MGRAA in this manner dating back to at least 1975. In New Mexico, the State Engineer has construed Section 72–5–23 and NMSA 1978, § 72–5–24 (1985), as the statutes governing a "change in the point of diversion, or the place or the purpose of use of a valid water right." Sections 72–5–23 and –24 control the transfer of water rights in New Mexico.

■ {17} In this case, as has been his practice for nearly thirty years, the State Engineer construed the applications as requests to transfer surface water rights and not as new appropriations of groundwater. Long-standing administrative constructions of statutes by the agency charged with administrating them are to be given persuasive weight, and should not be lightly overturned, since there is a statutory presumption that the orders of the State Engineer are the proper implementations of the water laws. *See* NMSA 1978, § 72–2–8(H) (1967). Moreover, the more long-standing the State Engineer's interpretation of a statute without amendment by the legislature, the more likely the State Engineer's construction reflects the legislature's intent. *In re Application of Sleeper,* 107 N.M. 494, 498, 760 P.2d 787, 791 (Ct.App.1988).

{18} Our Supreme Court has also construed statutes governing a change in point of diversion and purpose of use as a transfer of water rights, rather than the granting of a new appropriation. In *In re Application of Brown,* 65 N.M. 74, 332 P.2d 475 (1958), the Supreme Court held:

Statutes governing a change in point of diversion or a change in well location do not grant; rather they restrict the right of an appropriator to change his point of diversion or well location. In the absence of statutory procedures to effectuate such changes, the water user may change his point of diversion or well location at will, subject to the requirement that other water users will not be injured thereby.

*Id.* at 78, 332 P.2d at 477 (emphasis and citation omitted).

{19} In this case, the district court concluded that the applications were for transfers of existing surface water rights. As we have discussed, the district court's ruling regarding this issue is supported by the long-standing practice of the agency that administers the water laws, as well as current law in New Mexico. Therefore, we conclude that the district court did not misapply the law when it determined that the applications, as a matter of law, requested a transfer of existing surface water rights, rather than new appropriations of groundwater.

{20} The guidelines provide that applications requesting a permit for groundwater use will be approved if the applications will not impair existing water rights. Section 72–5–23 provides that a transfer of surface water rights may be granted where there is a finding that the applications will (1) not be detrimental to existing water rights, (2) not be detrimental to the public welfare, and (3) not be contrary to conservation of water within the state. Therefore, in the present case, Applicants had the burden of proof to show that the applications would not impair or be detrimental to existing water rights, would not be detrimental to public welfare,

and would not be contrary to water conservation within the state. We find no merit in Protestants' argument that the State Engineer had to find unappropriated water before approving the applications. It is true that a new appropriation of surface water requires a finding of unappropriated water. NMSA 1978, § 72-5-6 (1985). Yet, a transfer of water rights only requires the State Engineer to make a finding of the three factors noted above.

**ISSUE TWO: No genuine issue of material fact existed in determining if the water rights associated with the springs are less than the estimated yield of the springs.**

{21} Protestants argue that the district court erred in granting summary judgment because a genuine issue of material fact existed regarding whether the water rights associated with springs at the move-to area were less than the estimated yield of the springs from which Protestants obtain their surface water. Protestants contend that the State Engineer did not consider all declared water rights in determining the yield of the Rosa de Castillo spring and the San Franciso spring.

{22} We review de novo whether there is a genuine issue of material fact precluding summary judgment. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. We do not rule on issues of fact but rather determine if disputed issues of material fact exist. *Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 231, 836 P.2d 1249, 1252 (Ct.App.1992). We consider the evidence in the light most favorable to the nonmoving party. *LaMure v. Peters*, 1996-NMCA-099, ¶ 13, 122 N.M. 367, 924 P.2d 1379. The movant must make a prima facie case showing that it is entitled to summary judgment and then "the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth v. Thompson*, 113 N.M. 331, 334–35, 825 P.2d 1241, 1244–45 (1992). Once a movant has made a prima facie showing, the non-movant must show the court that a material or genuine issue of fact is present.

*Spears v. Canon de Carnue Land Grant*, 80 N.M. 766, 768, 461 P.2d 415, 417 (1969).

{23} The first step of our analysis is to determine if Applicants made a prima facie showing that the water rights associated with the springs are less than the estimated yield of the springs. *See Roth*, 113 N.M. at 334, 825 P.2d at 1244. In making this determination, we must first turn to NMSA 1978, § 72-7-1(E) (1971), which provides that in a de novo appeal of a State Engineer's order, the district court may consider evidence that was introduced at the hearing before the State Engineer. Here, Applicants made their prima facie case that the water rights associated with the springs were less than the annual yield of the springs by entering into evidence a memorandum from Jesse Ward, water resource manager for the Water Rights Division of the State Engineer's office. The memorandum indicated that Ward had researched the water rights associated with the springs and had determined that the water rights associated with the springs appear to be much less than the estimated yield of the springs combined. Ward reached this conclusion although he acknowledged that the State Engineer had declarations on file indicating rights to use water from the springs to a greater extent than historically used. Yet, in determining that the water rights associated with the springs were less than the annual yield of the springs, Ward only considered the amount of water actually being used by the declarants. The State Engineer's order approving the applications found that the estimated yield of the springs far exceeded the water rights associated with the springs.

{24} On appeal, Protestants do not challenge the State Engineer's finding that the annual yield of the springs far exceeded the water needed to irrigate the historically irrigated acres of land. Yet, Protestants do argue that the State Engineer erred in concluding that the water rights associated with the springs were only the amount of water needed to irrigate this smaller number of acres. Protestants assert that Ward had a duty to consider the amount of water actually claimed on the declarations, rather than the amount of water being placed in use by the

declarants. Protestants cite to *Templeton v. Pecos Valley Artesian Conservancy District*, 65 N.M. 59, 332 P.2d 465 (1958), where our Supreme Court held that each time a water right permit is granted, the State Engineer must "consider all prior appropriations to determine if there are any unappropriated waters." *Id.* at 69, 332 P.2d at 471.

{25} Apart from the fact that this is not a *Templeton* case as Protestants admit, since the groundwater of the MRGAA is not fully appropriated, we conclude in this case that the State Engineer did consider all prior appropriations and did measure the water rights as required by New Mexico law. The New Mexico Constitution provides that beneficial use is the basis, the measure, and the limit of the right to the use of water. N.M. Const. art. XVI, § 3. The concept of beneficial use "requires actual use for some purpose that is socially accepted as beneficial." *State ex rel. Martinez v. McDermett*, 120 N.M. 327, 330, 901 P.2d 745, 748 (Ct.App. 1995). "An intended future use is not sufficient to establish beneficial use if the water is not put to actual use within a reasonable span of time." *Id.* Here, the State Engineer, through Ward, utilized aerial photographs dating back to 1935 and determined that, although the declarations claimed a right to use water from the springs to irrigate a larger number of acres of land, water had only been beneficially used to irrigate a much smaller number of acres of land. We conclude that the State Engineer's method of measuring water rights associated with the springs is in accordance with New Mexico law and find no genuine issue of material fact in dispute regarding the district court's ruling that the annual yield of the springs far exceeds the water rights associated with the springs. Therefore, the district court did not err on this ground in granting Applicants' motion for summary judgment.

{26} Furthermore, we find no merit in Protestants' argument that the State Engineer adjudicated as forfeited or abandoned the water rights of individuals who had declarations of water rights on file, yet were not putting the water to beneficial use. The record is completely devoid of any such finding by the State Engineer. The State Engineer measured water rights by the amount of water being placed in beneficial use and did not measure water that was declared but was not being beneficially used. In so doing, the State Engineer was not declaring that water rights did not exist, but simply following the basis of measurement as required by the New Mexico Constitution. *See* N.M. Const. art. XVI, § 3. As our Supreme Court stated in *State ex rel. Erickson v. McLean*, 62 N.M. 264, 308 P.2d 983 (1957):

> Water appropriators and appropriations on each of the artesian basins of the state are numerous. The State is vitally concerned in every appropriation. The need for water is imperative, and often the supply is insufficient. Such conditions lead inevitably to many serious controversies, and demand from the state an exercise of its police power, not only to ascertain rights, but also to regulate and protect them.

*Id.* at 272, 308 P.2d at 988.

{27} Here, the hearing before the State Engineer's office was not for the purpose of adjudicating forfeitures or abandonments of water rights; rather it was a proceeding to determine whether the applications would impair or be a detriment to existing water rights, be detrimental to public welfare, or be contrary to the conservation of water within the State. Although certain findings by the State Engineer could be grounds for a conclusion that certain water rights had been forfeited or abandoned, the State Engineer did not draw such a conclusion. Thus, we rule that the State Engineer's findings were not an adjudication of forfeiture or abandonment of declared water rights that are not being put to beneficial use.

{28} Protestants did not offer any evidence apart from the declarations to rebut Applicants' prima facie case that the actual water rights associated with the spring were far less than the estimated yield of the springs. While it is true that NMSA 1978, § 72-1-3 (1961) provides that declarations "shall be prima facie evidence of the truth of their contents," "prima facie" simply permits the establishment of a fact if it is not rebutted. *Goodman v. Brock*, 83 N.M. 789, 792–

93, 498 P.2d 676, 679–80 (1972). Where, as here, the declarations were rebutted, they are insufficient to create an issue of fact because they are insufficient to satisfy any burden of proof. *See State ex rel. Martinez v. Lewis,* 118 N.M. 446, 449, 882 P.2d 37, 40 (Ct.App.1994). Therefore, the district court properly concluded that there existed no genuine issue of material fact precluding summary judgment insofar as the sufficiency of the yield of the springs is concerned.

**ISSUE THREE: The district court did not err when it concluded that the applications would not impair existing water rights.**

{29} Protestants claim that the district court erred by not finding that the applications would impair existing water rights. Protestants specifically argue that (1) any new depletion of surface water in a fully appropriated stream, as a matter of law, is per se impairment unless there is an offset of surface water at the move-to site, and (2) a genuine issue of material fact existed as to whether the depletions at the Rosa de Castillo spring, San Francisco springs, and Harris springs are de minimis.

A. *The district court correctly determined that a new depletion of surface water at the move-to site in a fully appropriated stream system is not per se impairment.*

{30} Protestants claim that the district court erred when it determined that a new depletion of surface water in a fully appropriated stream system is not per se impairment as a matter of law. Protestants specifically argue that any new depletion of surface water at the move-to site, no matter how small, constitutes impairment unless the Applicants offset the new depletions by obtaining and retiring surface water rights located at the move-to site. Protestants are confusing depletion effects on the stream system as a whole with depletion effects at the particular site.

{31} In partial response to this argument, we once again point to our Supreme Court's decision in *Langenegger,* which concluded that there would be very few, if any, transfers of water rights if the waters transferred were required to be identical. 82 N.M. at 420, 483 P.2d at 301. In this case, the State Engineer has issued guidelines determining that a transfer of surface water rights within the MRGAA is sufficient to prevent adverse effects upon the surface flow of the MRGAA. Our Supreme Court has held that the "special knowledge and experience of state agencies should be accorded deference." *Stokes,* 101 N.M. at 202, 680 P.2d at 342. The State Engineer ruled that the amount of water rights transferred exceeded the amount that Applicants would be allowed to pump plus any depletion effects to the Rio Grande stream system as a whole. Protestants have not challenged these findings 59–61 of the State Engineer's order, either below or on appeal, and they have not contended that their claimed issue of fact as to depletion effects, which we discuss below, applies to prevent summary judgment on the aspect of the State Engineer's order that deals with the effect of the transfer on the surface flow of the Rio Grande stream system as a whole.

{32} We are not persuaded by Protestants' argument that "under the relevant law and unique facts of this case, *any* new depletion of surface water, however small, would result in per se impairment." In considering groundwater, our Supreme Court has held that "[t]he lowering of a water table in any particular amount does not necessarily constitute an impairment of water rights of adjoining appropriators." *Brown,* 65 N.M. at 80, 332 P.2d at 479; *Mathers v. Texaco, Inc.,* 77 N.M. 239, 245, 421 P.2d 771, 776 (1966). In *Mathers,* the Court was faced with a decline of groundwater in a non-rechargeable basin. *Id.* at 245, 421 P.2d at 776. The Court held that the lowering of water levels in the wells of the protestants did not constitute impairment because such a result is inevitable if the water is to be put to beneficial use and to be made available to more than one appropriator. *Id.* at 245–246, 421 P.2d at 776. Furthermore, the *Mathers* Court found no impairment in that case even though the protestants suffered economic losses due to the State Engineer's approval of groundwater applications. *Id.* at 246, 421 P.2d at 776 (finding that the protestants

would have an increase in pumping costs and a lowering of pumping yields due to the granting of the applications).

{33} Our Supreme Court has also held that "[n]o impairment does not necessarily mean no change in conditions." *Stokes*, 101 N.M. at 201, 680 P.2d at 341 (internal quotation marks and citation omitted). Furthermore, this Court has also rejected the argument that a finding of impairment is required where the protestants' contend that they "need all the water they can get." *Sleeper*, 107 N.M. at 499, 760 P.2d at 792 (internal quotation marks omitted). In this case, Protestants make the same arguments that have been rejected by our appellate courts in the two cases mentioned above. Protestants argue that a change of condition to surface water at the move-to site is per se impairment, and that they need all the water they can get due to drought conditions. As our courts have held against these two arguments, we hold that the district court was correct to conclude that new depletions of surface water at the move-to site is not per se impairment.

■ {34} In response to Protestants' contention that new depletions of surface water will interfere with declarants whose priorities to water rights are senior to those of Applicants, we conclude that if the diversions of surface water become so great in relation to the supply of surface water so "that priorities must be asserted in order to protect the rights of senior appropriators, then the senior appropriators must enforce their rights in a proper manner, and, if necessary, in a proper proceeding." *Langenegger*, 82 N.M. at 422, 483 P.2d at 303.

B. *The district court correctly granted summary judgment because there is no genuine issue of material fact as to whether the applications would impair existing water rights.*

■ {35} Protestants argue that the district court erred when it granted summary judgment in favor of the Applicants because genuine issues of material fact were in dispute. Protestants contend that there was a genuine issue of fact as to whether the depletions to the Rosa de Castillo spring, Harris springs, and San Francisco springs were de minimis. We agree with Protestants that an issue existed regarding whether the depletions to the springs were de minimis; yet we find this issue was not material and therefore the district court did not err when it granted Applicants' motion for summary judgment. *Tapia v. Springer Transfer Co.*, 106 N.M. 461, 463, 744 P.2d 1264, 1266 (Ct. App.1987) (holding that summary judgment was proper even though disputed facts remain, if those facts are not material).

■ {36} Our review of the cases does not suggest that a finding of no impairment by the State Engineer must be based on a determination that there will be a de minimis effect on water levels that will be impacted by approval of an application. In *Brown*, the Court found no impairment where an application to change the location of a well caused a draw down of 3.9 feet in the protestant's well. 65 N.M. at 80, 332 P.2d at 479. The question of whether an application will impair existing rights is one that must be decided upon the facts of each case. *Mathers*, 77 N.M. at 245, 421 P.2d at 776.

{37} The material issues that were relevant to this case were whether the applications impaired existing water rights, were a detriment to public welfare, and were contrary to conservation of water within the State. *See* § 72–5–23. In this case, as will be discussed later, Applicants met their burden of proof in establishing that the facts supported a ruling as a matter of law that the Applications were not detrimental to public welfare or contrary to conservation of water within the state. Applicants also established their prima facie case that the applications would not impair existing rights through the affidavit of Ward, which concluded that the applications would not impair existing water rights. Yet, Protestants argue on appeal that a material issue of fact exists because there is a dispute as to the level of depletions at the move-to site. Having already noted that our Supreme Court has held in the case of groundwater rights that "[t]he lowering of a water table in any particular amount does not necessarily constitute an impairment of water rights of adjoining appropriators," *Brown*, 65 N.M. at 80,

332 P.2d at 479; *Mathers,* 77 N.M. at 245, 421 P.2d at 776, we determine that Protestants' argument, in and of itself, does not present an issue of material fact.

{38} In this case, viewing the evidence in the light most favorable to Protestants, the yield of the springs is sufficient to provide for the water rights being put to beneficial use by Applicants and Protestants, as well as other owners of water rights at the move-to site. Protestants did not challenge the findings of the State Engineer, which concluded that the annual yield of the springs as a whole is 291.4 acre-feet per year, that the historically irrigated acreage is 23, and that the current applications are to change the point of diversion of 15 acre-feet per year for a total amount of pumping by Applicants of approximately 30 acre-feet per year. Protestants' expert determined the surface flow of the springs would be depleted by 8.819 acre-feet per year after 100 years of groundwater pumping by Applicants. Thus, Protestants' own expert predicted that after 100 years of groundwater pumping at the rate contemplated by the applications in this case, the surface flow of the springs will be depleted by less than five percent and there will still be hundreds of acre-feet of water produced by the springs. Therefore, we find that viewing the evidence in the light most favorable to Protestants, no genuine issue of fact exists as to whether the applications would impair existing water rights at the move-to site.

**ISSUE FOUR: The district court did not err in granting summary judgment on the issues of public welfare and conservation.**

{39} Protestants argue that the district court erred in granting summary judgment in favor of the Applicants due to Protestants' being entitled to a trial on the issues of public welfare and conservation. Protestants filed a summary judgment motion in district court, which, in part, stated:

In this case, approval of the applications hinge on three criteria: 1) there can be no impairment to existing water rights; 2) the changes must not be detrimental to the public welfare; and 3) the changes may not

be contrary to conservation. See [sic] NMSA 1978, § 72–5–23, § 75–12–3. This motion is concerned only with the first criterion, namely whether approval of the applications will impair existing rights.

Applicants filed a response to Protestants' motion for summary judgment and also filed a cross-motion for summary judgment. Applicants' motion for summary judgment argued that the State Engineer properly analyzed and considered all relevant factors, including whether the applications would impair existing water rights, be detrimental to public welfare, or contrary to conservation of water within the state. Applicants also noted that Protestants had not challenged the State Engineer's determination regarding the issues of public welfare and conservation. Therefore, Applicants argued that because the State Engineer had properly analyzed and considered all relevant factors, the district court should affirm the State Engineer's approval of the applications.

{40} Protestants did not address the issues of public welfare or conservation of water in their response to the Applicants' motion for summary judgment. Protestants also did not address the issues in oral arguments, although both issues were raised by Applicants in their cross-motion for summary judgment. To preserve an issue for review on appeal, it must appear that the appellant fairly invoked a ruling of the district court on the same grounds argued in the appellate court. *Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987). Because Protestants did not do this, we conclude that the district court did not err in granting final summary judgment on the issues of public welfare and conservation.

**ISSUE FIVE: The district court did not err in denying Protestants' motion for summary judgment.**

{41} Protestants argue that the district court erred when it failed to grant Protestants' motion for summary judgment. Protestants claim that under the circumstances of this case, there is per se impairment to the water rights at the move-to location, because it was undisputed that the applications would lead to new depletions of surface water at the

move-to site and that the surface water of the Rio Grande stream system is fully appropriated. Having already held against the Protestants on this argument, we conclude that the district court did not err in denying Protestants' motion for summary judgment. Although no genuine issues of material fact exist in this case, Protestants were not entitled to summary judgment as a matter of law. *Self,* 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582.

## CONCLUSION

{42} For these reasons, we hold that no genuine issues of material fact exist in this case, and that the district applied the correct law in granting summary judgment in favor of the Applicants. Accordingly, we affirm.

{43} **IT IS SO ORDERED.**

WECHSLER, J., concur.

RODERICK T. KENNEDY, Judge (concurring in part and dissenting in part).

KENNEDY, Judge (concurring in part and dissenting in part).

{44} I respectfully dissent. In a developing legal climate where we are coming to recognize that water is a necessity in limited supply, the courts should encourage definitive measurement in calculating water availability, should provide clear and consistent parameters for defining terms like "impairment," and should take on their duties of de novo review with a critical eye and willingness to independently review the evidence before them.

{45} The Majority is correct in holding that the applications are not for new water appropriations, and that a new depletion at the move-to site is not per se impairment of that source of water. I concur fully with these holdings. Also, it is apparent in this case that Protestants concede other matters that limit the scope of the controversy significantly, which the Majority Opinion correctly addresses. Therefore, my disagreement is limited to discussing what I consider to be sufficient issues of material fact that should have precluded summary judgment and merited a full and proper de novo review of the case.

**New Mexico Constitution Is Not a Water Gauge**

{46} The salient question is whether "the State Engineer did consider all prior appropriations and did measure the water rights as required by New Mexico law" in coming to its decision. *Templeton*'s application is broader than the Majority suggests, simply because it holds that "the State Engineer can only grant permits to appropriate waters which are not already appropriated," and that permits granted are "subject to the rights of all prior appropriators from the same source." 65 N.M. at 69, 332 P.2d at 472. *Templeton* fully recognized the duty to appropriate water so as not to impair existing rights. *Id.* To do so then requires ascertaining the existence and effect of such existing rights.

{47} To accomplish this assessment requires a conceptual jump by the Majority. While the Constitution states that "[b]eneficial use shall be the basis, the measure and the limit of the right to the use of water," New Mexico Constitution, art. XVI, § 3, beneficial use has little utility as a unit of measurement. In the Majority Opinion, we fail to answer the question of how to deal with rights that are adjudicated not to exist (albeit only for purposes of this case) for lack of beneficial use. To hold that "all prior appropriations" were considered and measured by the State Engineer in its process of granting Applicants' permits, the Majority relies on the State Engineer's determinations that not all existing water rights to the springs have been beneficially used, and therefore does not count them against the springs' yield. These rights should have been counted. Impairment for this case is something that happens to the Protestants' springs, not the broad water system as a whole. The calculus of determining whether total effect on the springs would be accounted for by their yield lessened by existing rights plus what will be drawn by Applicants' wells cannot ignore water rights that have not been properly extinguished.

{48} So in this case, "although the [existing] declarations claimed a right to use water from the springs to irrigate a larger number

of acres of land," those rights, though not held by anyone to be abandoned, forfeited, or otherwise extinguished, were not counted because of Ward's determination that water from the springs "had only been beneficially used to irrigate a much smaller number of acres of land" than the total number represented by all water rights that exist.

{49} The State Engineer in its response to Protestants' motion for summary judgment explicitly said that his "determinations regarding impairment, or lack thereof, do not constitute adjudications." Forfeiture of water rights may occur after four years of no beneficial use, but forfeiture of rights requires notice and action from the State Engineer. NMSA 1978, § 72–12–8(A) (2002). No such process has been undertaken to extinguish the prior rights in question for lack of beneficial use of the allocated water since 1863, 1907, 1935, or any other year. Absent such action, I urge that the declared rights should be taken into account when calculating demand.

{50} The Majority's Opinion thus goes to great lengths in opposite directions, stressing that the uncalculated rights are not abandoned, forfeited, or adjudicated, while ratifying findings of the State Engineer that ignore such rights. When the Majority agrees with this conclusion, it must then appear to the reader to adjudicate those water rights by dicta. I disagree that these rights can be ignored in calculating demand for the springs' water, and urge that the complete picture should be presented before impairment of a source can be evaluated accurately.

{51} The State Engineer cannot have it both ways. We hold that Protestants' assertion of impairment was rebutted by the State Engineer's showing regarding anticipated demand against yield of the springs. For the Majority Opinion to adopt findings that rights not concerned in this action do not exist for calculating demand versus yield in the spring, while explicitly stating that we do not regard them as forfeited or abandoned by legal definition, is contradictory. Otherwise, we appear to impermissibly expand the comment in *McLean*, 62 N.M. at 272, 308 P.2d at 988, that "[r]egulation ... is not confiscation," to a holding that power to reg-

ulate implies a power to ignore existing rights. The Majority's holding that the State Engineer's findings were not an adjudication requires an explanation as to what the findings really are. Flatly, other rights exist that were considered by the State Engineer to be unimportant to the question of impairment of the springs. Such a determination is therefore at least an incomplete process, at most a credulous statement given how extensively we try to explain how little those rights matter. In this regard, the Majority Opinion fails to deliver its reason clearly enough and makes unwarranted assumptions based on unwarranted findings. Because the rights exist, and were not subtracted from the springs' output, we do not know, for instance, if the Applicants' well might still have had a negligible effect on the springs upstream. Taking all the unextinguished rights into account so as to assure a calculation based on fact, not assumption, would generate facts sufficient to ultimately survive or support summary judgment. That process was short-circuited in this case.

### "Impairment" Is a Functional Definition, Not a Policy

{52} The Majority Opinion states that "Protestants are confusing depletion effects on the stream system as a whole with depletion effects at the particular site." To the Majority, this precludes the issue of impairment of the springs from being sufficiently material as to preclude summary judgment. I believe that the significance flows in exactly the opposite direction—namely that the stream system as a whole is not where impairment is the issue. I am not convinced that whether a system that is "hydrologically connected" in the entire MRGAA answers this case's problem of small location-specific springs being impaired by groundwater pumping for a 106–unit residential development. Relinquishing surface rights in Valencia County might not have much to do with making sure there is enough water in Las Huertas Canyon to feed a spring. Under our case law, impairment of water rights is a factual question to be resolved on a case-by-case basis.

{53} The Majority cites a number of cases, such as *Brown*, 65 N.M. at 80, 332 P.2d at 479, and *Mathers*, 77 N.M. at 245, 421 P.2d at 776, to show that in some circumstances depletion does not equal impairment. The cases cited all stand for the proposition that a global approach and evaluation (the very antithesis of a per se rule) is required to assess the impairment question, not a concentration on a single factor. The Majority Opinion does not go in this direction, taking instead a narrow approach rejected by other cases. For example, *Brown* discussed the lowering of a water table, but that was a groundwater-only case; well location was one factor the court said had to be considered along with all the characteristics of the aquifer. 65 N.M. at 80, 332 P.2d at 479. *Brown* did not involve a surface-for-groundwater transfer, but drilling a well under existing rights in a different location and applying for the move after the fact. *Id.* at 76, 332 P.2d at 476. That a "draw[ ]down of 3.9 feet in the water table" did not *necessarily* constitute impairment in that case is not a basis for inferring anything beyond what *Brown* actually said: "all characteristics of the particular aquifer must be considered *along with* well locations." *Id.* at 80, 332 P.2d at 479 (motion for rehearing) (emphasis added). There were many variables in the *Brown* equation, which, if applied, might well lead to a better-developed factual basis in a de novo trial for a conclusion as to whether Protestants' rights were actually impaired.

{54} Our prior cases demonstrate the depth of de novo review that I feel this case should have received below. As the Majority Opinion points out, *Mathers* dealt with a non-rechargeable basin. 77 N.M. at 245, 421 P.2d at 776. *Mathers* said that a declining water level is to be expected when one pumps from a finite basin. *Id.* at 246, 421 P.2d at 776. *Mathers* held that the lowering water level alone is insufficient for impairment of others' rights while lamenting that "a definition of 'impairment of existing rights' is not only difficult, but an 'attempt to define the same would lead to severe complications.'" *Id.* at 245, 421 P.2d at 776 (citation omitted). *Stokes*, on the other hand, dealt with the encroachment of salty water resulting from increased pumping at the move-to location. 101 N.M. at 201, 680 P.2d at 341. There, the impairment was the expected increase in salinity; though not minimal, the court held that there was no impairment. *Id. Sleeper* is similarly uninstructive—the statement the protestants made there, that they "need[ed] all the water they [could] get," showed nothing. 107 N.M. at 499, 760 P.2d at 792. The issue was not what the protestants wanted, but whether the applicants were retiring adequate water rights (established with some particularity by the applicants) in the Rio Brazos basin. *See id.*

{55} Next, *Langenegger* allowed the owner of surface rights to drill a well upstream in an aquifer that gave water to his surface source so as to pre-capture the water that would eventually get into the Pecos River. 82 N.M. at 419, 483 P.2d at 300. In this case, could Applicants capture surface water before it recharged the source of their wells? Saying that Protestants can later sue if their springs are truly impaired does not obviate today's responsibility of a full exposition of whether existing rights plus the new use would impair the springs. Our saying that " '[n]o impairment' does not necessarily mean 'no change in conditions' " only underscores to me the possibility that if things were given an opportunity for real review, the possibility for change in the springs' flow could be more honestly evaluated. *See Stokes*, 101 N.M. at 201, 680 P.2d at 341 (internal citation omitted). Overwhelmingly in these cases, a review of all factors involved supported the calculus of impairment. We owe no less breadth of inquiry to the case before us.

{56} Further, the Majority Opinion needs to say what impairment is in general, since we say the effect on the springs is not de minimis. Once we hold that more than a de minimis effect exists, we should encourage district courts, in de novo review, to undertake an evaluation of just what might be impairment of the prior rights. The effect on the springs is a material issue, and one that the Majority Opinion concedes may be more than de minimis. *See Spencer v. Health Force, Inc.*, 2005–NMSC–002, ¶ 26, 137 N.M. 64, 107 P.3d 504 ("Genuine issues of material fact ... preclude summary judg-

ment."). The issue is the springs, not the stream system.

### Is Trial De Novo Inconsistent with Summary Judgment Based on Administrative Findings?

{57} I am manifestly unsure in a case like this, with so many facts left undetermined, whether summary judgment was appropriate. This uncertainty is compounded by my examination of a district court's de novo review of State Engineer decisions. Under the New Mexico Constitution, art. XVI, § 5, a proceeding appealing the State Engineer's ruling "shall be de novo as cases originally docketed in the district court." This provision established the district court's power "to find facts[,] ... to form conclusions based upon those facts, and to enter enforceable judgments, orders and decrees supported by those facts and conclusions." *In re Application of Carlsbad Irrigation Dist.*, 87 N.M. 149, 151–52, 530 P.2d 943, 945–46 (1974). Our Supreme Court has said that in its de novo review, the district court considers the evidence presented to the State Engineer then it "*also* hears additional evidence, and is not called upon to determine whether the engineer or the board of water commissioners erred ... but must form its own conclusion and enter such judgment as the proof warrants and the law requires." *Id.* at 150, 530 P.2d at 944 (internal quotation marks and citation omitted) (emphasis added). This has been called "pure de novo review." *Clayton v. Farmington City Council*, 120 N.M. 448, 453–54, 902 P.2d 1051, 1056–57 (Ct.App.1995) (emphasis omitted). *Carlsbad Irrigation District* also recognized that de novo review may concern the same ultimate issues and facts as were determined by the State Engineer, and that the district court's findings and those below may well be very similar. 87 N.M. at 152, 530 P.2d at 946. Such a similarity did not mean "that the district court did not consider the evidence anew." *Id.* The district court "could and should have recited the substance of its judgment, rather than merely affirming the findings and decision of the Engineer," but the district court's failure to do so there did not necessarily deprive the protestants of a de novo review. *Id.* Unfortunately, in the instant case as opposed to *Carlsbad Irrigation District,* no new evidence was taken, and the case was resolved by summary judgment. We cannot know if the district court fulfilled the aspirations stated in *Carlsbad Irrigation District.*

{58} The district court in its de novo review should demonstrate that it has independently decided the case on the facts before it, not affirm by summary judgment the assumptions the State Engineer makes to justify its ultimate decision. This is particularly so where the decision is based on ignoring water rights that are not abandoned, forfeited, or adjudicated not to exist. Those rights should specifically be taken into account or there is a material question of fact as to impairment of the springs.