483 P.2d 297

In the Matter of the Application of A. W. Langenegger, No. 646 and RA–1851, and Langenegger and Sons, No. 188 and RA–5379 Consolidated.

A. W. LANGENEGGER and Langenegger and Sons, Applicants-Appellants,

v.

CARLSBAD IRRIGATION DISTRICT, a Quasi-Municipal Corporation, Protestant-Appellee,

S. E. Reynolds, New Mexico State Engineer, Respondent-Appellant.

No. 9026.

Supreme Court of New Mexico.
March 29, 1971.

James A. Maloney, Atty. Gen., Paul L. Bloom, Sp. Asst. Atty. Gen., Santa Fe, for S. E. Reynolds.

Hinkle, Bondurant, Cox & Eaton, Roswell, for Langenegger.

Walker & Estill, Carlsbad, for appellee.

## OPINION

OMAN, Justice.

Respondent-appellant, New Mexico State Engineer (hereinafter referred to as Engineer), after conducting a hearing, entered his decision approving the applications of appellant-applicants (hereinafter referred to as applicants), to supplement their rights to irrigation waters from the Pecos River, by diverting through wells, waters from the artesian aquifer of the Roswell Underground Basin. The protestant-appellee (hereinafter referred to as protestant), thereupon appealed the decision of the Engineer to the District Court of Chaves County, and the case was tried de novo by that court, as provided in Article XVI, § 5, Constitution of New Mexico.

The applicants and Engineer have now taken an appeal from a judgment entered by the District Court in favor of protestant and denying the applications. We reverse.

The following facts were found by the trial court, are supported by substantial evidence, and are not seriously disputed by applicants and the Engineer. Applicants are the owners of rights to waters from the Pecos River for the irrigation of 966.09 acres of farm lands in Chaves County. The rights for the irrigation of 316.09 of these acres have a priority date of July 25, 1908, and the rights for the irrigation of the remaining 650 acres have a priority date of March 22, 1912. The amount of water required to irrigate the 966.09 acres is approximately 2,900 acre feet per year.

The waters of the Pecos River, at the points of applicants' diversions thereof, consist of base flows and flood flows. The base flows are the waters which have passed through an aquifer before entering the river and its tributaries. The two aquifers here involved are: (1) the artesian aquifer of the Roswell Underground Basin, and (2) the shallow aquifer which is also referred to as the Valley Fill. In most of the basin, a formation known as the Chalk Bluff, or Red Beds, is encountered between the artesian aquifer and the shallow aqui-

fer. This formation is a semi-confining layer which slows leakage from the artesian aquifer to the shallow aquifer above, and, thus, contributes to the artesian conditions of the lower, or San Andres Limestone aquifer. See Templeton v. Pecos Valley Artesian Conserv. Dist., 65 N.M. 59, 332 P.2d 465 (1958), in which the structures of the basin are described.

The flood flows are waters resulting from falls of precipitation within the river drainage and which flow over the surface area thereof until their entry into the river.

During the months of April to September, inclusive, for the period 1906 to 1914, the base flow averaged 18% and the flood flow 82% of the total river flow. During these years the monthly average of the base flow ranged from 2% of the total river flow in August of 1908 to 98% thereof in April of 1910.

The base flow of the river, for the period 1905 to 1914, averaged 76,060 acre feet per annum, and for the period 1956 to 1965, this flow averaged 26,300 acre feet per annum. Approximately 70% of this base flow entered the river above applicants' points of diversion, and only aproximately one-third thereof reached these diversion points each year during the irrigation season, which is from April 1 through September 30.

During the irrigation season of 1908, the year within which the priority date of a portion of applicants' rights was fixed (July 25, 1908), only 9% of the river water available at applicants' points of diversion was base flow and 91% was flood flow. During the irrigation season of 1912, the year within which the priority date of the remaining portion of applicants' rights was fixed (March 22, 1912), the river water available at the points of diversion was 22% base flow and 78% flood flow.

All of the waters of the Roswell Underground Basin are now fully appropriated. There are rights to divert 88,775 acre feet of water per annum from the basin with priority dates earlier than July 25, 1908, and rights to divert 303,684 acre feet of water therefrom with priority dates subsequent to July 25, 1908.

There are rights to divert 160,712 acre feet of water per annum from the basin with priority dates earlier than March 22, 1912, and rights to divert 231,747 acre feet per annum with priority dates subsequent to March 22, 1912.

Withdrawals of water from the basin have substantially reduced the base flow reaching applicants' points of diversion, and this reduction has resulted in shortages of water for the irrigation of applicants' lands during recent years.

From the foregoing recited facts, the trial court concluded that to the extent applicants should be permitted to take more than 9% of their total water rights with the priority date of July 25, 1908, and more than 22% of their total water rights with the priority date of March 22, 1912, from the proposed wells, they would, in effect, be accomplishing a new appropriation from the waters of the Roswell Underground Basin and would thereby impair existing rights. We differ with this conclusion.

Except as above indicated by the recited facts, and as hereinafter discussed, the question of priorities was not involved in these proceedings. The base flow, at the points of applicants' diversions from the river, was at all times adequate to supply the rights of applicants.

It is apparent from the foregoing recited facts, and it is not disputed in the evidence thereon, that the base flow constitutes the relatively stable waters of the river. The flood flows constitute waters which fluctuate greatly in quantity from time to time. As shown by the above recited facts found by the trial court concerning the base flow for the months of August 1908 and April 1910, this base flow, and necessarily the flood flow also, fluctuated from 2% to 98% of the total river flow during the months of April through September, and this fluctuation is very largely, if not almost entirely, due to the fluctuation in the precipitation during these months in the river drainage area. However, as express-

ly found by the trial court, there has been a substantial reduction in recent years of the base flow into the river by reason of withdrawals from the basin. These withdrawals occur very largely during the irrigation season, and this reduction in the base flow has resulted in shortages of water for the irrigation of applicants' lands.

■ Applicants are appropriators of water from the mainstream or channel of the Pecos River, and, as such, are entitled, subject to the rights of other appropriators, to rely and depend upon all the sources which feed the main stream above their points of diversion, all the way back to the farthest limits of the water shed. Templeton v. Pecos Valley Artesian Conserv. Dist., supra; Richlands Irr. Co. v. Westview Irr. Co., 96 Utah 403, 80 P.2d 458 (1938). They are not limited to pursuing a particular portion or percentage of these waters which may have been accumulated in a particular body, rivulet, arroyo, etc., before being discharged into the main stream. To so limit them would be to deprive them of their rights to rely and depend upon all sources which feed the main stream from which their appropriations were made. They would also be deprived of their right to rely and depend upon all sources which feed the main stream, if every rivulet, arroyo, body of water, seepage, etc., through which waters are conducted to the main stream were measured and only the percentage proportion, which the waters from each thereof bore to the entire stream flow, were permitted to be taken from the source waters of each of said contributing conduits.

■ It is commonly known and understood that some contributing conduits of water to the main stream of a river may be diminished, or even dried up, either temporarily or permanently, by the varying patterns of precipitation throughout the river's water shed, by reason of other natural phenomena, or by reason of man-made structures or activities. A system, such as that adopted by the trial court, would require measuring and assigning to each appropriation a percentage contribution thereto from each contributing source on the priority date of each appropriation. The results of these computations could vary greatly as to each contributing source from appropriation to appropriation, as is evidenced by the differences reflected in the two appropriations of applicants from just two contributing sources. If the priority dates and the contributing sources were multiplied to correspond with the number and dates of all appropriations from, and all the separate, measurable, contributing flows into, the Pecos River, it is at once apparent that amounts and priorities of appropriations so determined would have little significance. The administration of the waters of the river under such a system would be practically impossible.

In addition to the foregoing recited facts, the trial court found that applicants had wholly failed to prove that any portion of the waters which came from the Roswell Underground Basin lying upstream from applicants' points of diversion from the river, " * * * flows evenly to the respective sites of the proposed well locations. To the contrary, the record yields uncontradicted expert testimony that the water that would be taken by the proposed wells never contributed to the water taken by the applicants and their predecessors in title at their respective points of diversion on the Pecos River, * * *"

There is substantial evidence to support these findings, except it appears uncontradicted from the testimony of protestant's expert, which is the only evidence directly on the matter of the direction of the base flow, that the waters to be intercepted and diverted from the artesian aquifer by applicants' proposed wells would be waters reaching the river both above and below the points of applicants' present diversions from the river. This is consistent with the position taken by protestant in its answer brief. From these findings, the court concluded that the granting of the applications would be to grant a new appropriation of water in which the applicants did

not previously have any rights. We disagree with this conclusion.

It is apparent from the record, from the language of these findings, and from the answer brief, that protestant and the trial court rely upon the following language from the opinion in Durand v. Reynolds, 75 N.M. 497, 406 P.2d 817 (1965):

> "Applicants did not prove that the water in the 'Nine-Mile Draw' area flows evenly to the site of the proposed well locations! To the contrary, the record yields expert testimony that certain amounts of the water that would be taken by the proposed wells never contributed to the water taken in the 'Nine-Mile Draw' area. Assuming such to be true, the effect of applicants' application, if granted, would be to grant a new appropriation to water in which they did not previously have any rights. * * *"

The Engineer and applicants argue this language is unsupported by any authority and is dictum. We agree the principle announced by this language was unnecessary to the decision of the issues presented on the appeal in the Durand case, and no authority was given in support thereof. However, the principle was apparently announced as an additional reason for reversing the trial court and as additional support for the finding by the Engineer that the granting of the application there involved "* * * would impair existing rights in and to the Pecos River and the Roswell Artesian Basin. * * *"

If this language found in the Durand decision means a change in point of diversion can legally be accomplished only if the waters to be taken from a proposed point of diversion are identical with the waters that have been taken from a presently established point of diversion, then there could be very few, if any, changes in points of diversion. Although there are undoubtedly some reasons for seeking changes in points of diversion other than the failure of the volume of the waters at existing points of diversion, this is the reason for the applications here involved and is the reason for many, if not the great majority, of the applications for changes in points of diversion. This was precisely the reason for the applications in Templeton v. Pecos Valley Artesian Conserv. Dist., supra. The facts of that case were that there had been a decline in the waters of the Rio Felix from which the applicants had diverted their water, just as there has been a decline in the waters of the Pecos River in the case now before us. In the Templeton case, appellants claimed the granting of the changes in points of diversion from the river to the shallow aquifer, or valley fill, would constitute a new appropriation. Both the trial court and this court rejected that contention, even though it was apparent the transfer of the points of diversion as applied for could not possibly have resulted in a recovery from the wells of the same or identical waters which had theretofore been diverted from the Rio Felix. It is true the trial court in that case found the source of the water from wells drilled into the shallow aquifer was the same as the source of the water diverted by applicants from the Rio Felix, to wit, the shallow aquifer. In the case now before us, it is true, as discussed above, that one of the sources of the water in the Pecos River is the artesian aquifer and will be the source of any water diverted through the proposed wells. As stated and discussed above, applicants have the right to pursue this source, as well as all the other sources which feed the main stream above their points of diversion from the river.

To interpret and apply the above quoted language from the Durand case, in the manner in which the trial court interpreted and applied it here, is to divide the artesian aquifer into two sources of the waters of the Pecos River, insofar as applicants are concerned, whereas in the Templeton case, the shallow aquifer was considered in its entirety as the one source of the waters of the Rio Felix.

Although the question of whether the shallow aquifer constituted two or more sources of the waters of the Rio Felix, within the principle subsequently announced in the Durand case and here applied by the trial court, probably was not raised in the Templeton case, the contention was made and rejected that the diversion of waters from the aquifer through the proposed wells constituted a new appropriation. In the present case the trial court reached exactly the opposite result by a division into two sources of the waters from the artesian aquifer which reach the Pecos River.

■ Inherent in a water right is the right to change the place of diversion, subject only to the requirement that the rights of other water users not be injured or impaired thereby. Durand v. Reynolds, supra; Clodfelter v. Reynolds, 68 N.M. 61, 358 P.2d 626 (1961); Application of Brown, 65 N.M. 74, 332 P.2d 475 (1958). If the principles of diversion, which the trial court adopted, at least in part, from the language in the Durand case, were applied to all appropriations of waters from the Roswell Underground Basin and the Pecos River, the result would necessarily be the denial to most appropriators of their rights to change the places of their diversions and their rights to pursue all sources which contribute to the waters of the basin, or to the waters of the river above their points of diversion.

In addition to the foregoing recited facts, the trial court found: "There was not, in 1908, and there has never been adequate water flowing in the Pecos River to serve the prior right of the Carlsbad Irrigation District and other appropriators from said river, having rights prior in time to said year."

It would appear the court's conclusion, that impairment to existing rights would result if the applications were granted, is predicated upon the court's conclusion discussed above, that the diversion of waters

from the artesian aquifer through the proposed wells would amount to a new appropriation. However, appellants have asserted as their second point relied upon for reversal that: "The Court Erred in Holding That the Supplemental Wells Applied for Would Impair Existing Rights Because the Protestants' Rights are Prior in Time to Those here Sought to be Supplemented."

Protestant in response thereto has stated it "agrees wholeheartedly with appellants" that: "The fact that Applicants' rights are junior in time to certain rights of Protestants and others is absolutely immaterial."

This agreement of the parties would seem to dispose of Point 2. However, protestant then returns to the findings and conclusions attacked under the first point and again urges " * * * it is apparent that the granting of these applications would permit Applicants to enlarge their original appropriation to the injury of both junior and senior appropriators of the waters of the Pecos River * * *." The applicants did not seek, and the Recommendations of the Hearing Examiner, which were accepted and adopted by the Engineer, did not undertake to enlarge or increase applicants' original appropriations, but only sought and authorized applicants to follow the base flow to its source —the artesian aquifer—and to supplement therefrom the waters diverted by applicants from the river to the extent necessary to restore to applicants their original appropriations.

It is true the granting of the applications would effect some changes in the waters of the aquifer and also of the river, but change alone is not to be equated with impairment of the rights of others. The change, which has made it necessary for applicants to pursue the sources of the waters in which they have rights, as expressly found by the trial court, is the reduction in the base flow reaching applicants' points of diversion. This reduction in base flow has resulted from withdrawals of

water from the basin, and has also resulted at times in insufficient amounts of water in the river to irrigate applicants' lands. Applicants, as well as protestants and all other appropriators, have the right, subject to the rights of each other, to pursue to their sources the waters from which the appropriations were made, but protestant has acquired no right to keep applicants from realizing the benefits of their full appropriations by insisting on the perpetuation of a condition which has developed by reason of withdrawals by others from one of the principal and more stable sources of the waters in which applicants have rights.

If the diversions of waters from the basin, or from the river, become so great, in relation to the supply of these waters, that priorities must be asserted in order to protect the rights of senior appropriators, then the senior appropriators must enforce their rights in a proper manner, and, if necessary, in a proper proceeding. See in these regards Worley v. United States Borax and Chemical Corp., 78 N.M. 112, 428 P.2d 651 (1967). As above stated, the case now before us is concerned with applications to change points of diversion for a limited purpose, and, as agreed by the parties, the question of priorities is immaterial to a determination of the issues presented.

It follows from what has been said that the judgment of the trial court must be reversed and the cause remanded with directions to enter judgment for the applicants, consistent with this opinion, granting to them the right to make diversions of waters from the artesian aquifer through the proposed wells in the amounts and in a manner sufficient to restore to them the waters to which they are entitled, without impairing the rights of other appropriators.

It is so ordered.

COMPTON, C. J., and TACKETT, J., concur.